Filed 2/28/22  P. v. Soto CA2/8
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B304485 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA085911) |
| v. | |
| JAMES SOTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed in part, reversed in part and remanded with directions.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

In 2012, appellant James Soto, a founding member of the Mexican Mafia, was released from prison. In 2013, he began threatening Timothy Cullen to obtain money from Cullen's marijuana dispensary business. In 2019, a jury convicted Soto of one count of extortion by threat or force in violation of Penal Code[1] sections 519 and 520 and found true the allegation that the offense was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(4)[2]. The true finding on this allegation extended the statute of limitations on the underlying offense, which would have otherwise expired.

Soto appealed from the judgment of conviction, contending the evidence is insufficient to prove the Mexican Mafia is a criminal street gang within the meaning of section 186.22. He contended the evidence shows the Mexican Mafia is a "prison" gang and section 186.22 applies only to "street" gangs. In the alternative, he contended the necessary predicate offenses proven by the People are insufficient to support the jury's true findings because (1) they are not the type of crimes the STEP Act was intended to prevent; and (2) they were committed before the Mexican Mafia changed its character and mission in 1992 to become active on the streets, at which point it became a "different" gang. He also contended reversal of the gang enhancement would require reversal of the extortion conviction, because section 186.22., subdivision (b)(4) had the effect of

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Section 186.22 is part of the California Street Terrorism Enforcement and Prevention Act. (§ 186.20.) This act is commonly referred to as the STEP Act, and also includes section 186.21, which is discussed throughout this opinion.

extending the statute of limitations for the extortion count. On October 13, 2021, we affirmed the judgment of conviction. We did not reach the statute of limitations issue.

On December 29, 2021, the California Supreme Court granted appellant's petition for review and transferred the matter to us with directions to vacate our decision and reconsider the cause in light of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699), which became effective January 1, 2022. Assembly Bill No. 333 amended several provisions of section 186.22. We requested briefing from the parties who agree that the true finding on the section 186.22 enhancement must be reversed. We agree as well. The parties disagree on whether the allegation may be retried.

We now vacate our previous decision. We hold that the true finding on the gang enhancement must be reversed and that it can be retried. If the People elect not to retry the gang allegation, or if the allegation is found not true, the trial court should decide whether the statute of limitations requires reversal of the underlying extortion conviction.

## FACTUAL BACKGROUND

In 2011, Tim Cullen ran a marijuana dispensary in Valley Village, sometimes referred to as North Hollywood. Individuals claiming to be members of the Mexican Mafia threatened to destroy his business and kill him unless he paid them money. He paid.

In 2013, an acquaintance told Cullen that appellant Soto wanted to speak with him. Cullen met appellant at a hotel. Appellant said he was a founding member of the Mexican Mafia. He was upset that individuals had been demanding money from Cullen in the name of the Mexican Mafia. Appellant said they

3

were going to get to the bottom of it "because nobody uses the Mexican Mafia name like this." Cullen said appellant made it sound like the threats for money were wrong and the individuals should not have been making the threats. He believed the demands for money would end.

After the meeting, the individuals stopped demanding money from Cullen. Cullen then learned that he was now supposed to be paying money to appellant. One day, appellant came to Cullen's place of business with Jose "Dreamer" Rodriguez and Jaime "Cholo" Garcia, who Cullen learned were also members of the Mexican Mafia. They told Cullen he now owed them money for protection. Cullen gave appellant $3,000. Thereafter, Cullen was supposed to pay the men 50 percent of his business profits. Cullen believed he was paying the money to appellant, but Garcia would collect it. Cullen made a few payments to Garcia totaling about $30,000.

At some point, appellant was arrested on unrelated matters, and Cullen started avoiding Garcia and the others. Cullen believed it was his chance to get away. At around the same time, the city instituted new rules for Proposition D compliance and Cullen had to move his shop to a new location.

From December 14 to December 15, 2013, Cullen moved much of his business to a new location. On December 15, after Cullen failed to show up at a meeting arranged with Garcia, Garcia broke into an outside area at Cullen's old dispensary and stole marijuana plants and packaged trimmings which had not yet been relocated. Garcia was assisted by Jose "Shooter" Sanchez, who had sometimes accompanied Garcia and Rodriguez when they collected money. The men's theft was caught on

4

surveillance cameras. At that point, Cullen decided to call the police.

After his arrest on federal drug charges on December 10, 2013, Rodriguez agreed to cooperate with the People. He testified at trial under a grant of use immunity and provided background information on Cullen's extortion.

Rodriguez explained that appellant, a founding member of the Mexican Mafia, was released from prison in 2012 and moved to Visalia. Appellant was in his late 70s. Rodriguez, an associate of the Mara Salvatrucha 13 gang (MS 13), had been picking up collections for one Ruiz Geraldo Vega. Vega told Rodriguez about the Mexican Mafia and implied he was a member. When problems arose with Vega over collections in West Los Angeles, Rodriguez decided to go to Visalia and speak with appellant to confirm whether Vega was a member of the Mexican Mafia.

After meeting with appellant, Rodriguez decided to give appellant Vega's share of the money Rodriguez collected. This earned appellant's love and respect.

At some point before Rodriguez became a Mexican Mafia member, he learned that a person claiming to be part of the Mexican Mafia was forcing Cullen to pay protection money. Appellant was also made aware of this situation.

In 2013, appellant sponsored Rodriguez to become a member of the Mexican Mafia. Jaime Garcia became a member of the Mexican Mafia the same day. Garcia was originally a member of the East Side Trece gang.

Rodriguez, Garcia and appellant then began "taxing" Cullen. "Somehow, [appellant] got, like, an agreement with [Cullen] to get some of the money monthly . . . getting half of whatever . . . the dispensary was producing." Rodriguez, Garcia

and appellant split the money equally. Rodriguez explained that the person or persons who had previously been obtaining money from Cullen "went away" once they heard appellant was involved.

Rodriguez explained Cullen paid them money because paying Mexican Mafia members was like insurance to protect the dispensary. As Mexican Mafia members, they got out word that the dispensary was theirs, relying on the fear of the Mexican Mafia among criminal elements to guarantee the dispensary's safety. After appellant was arrested in 2013, he sent messages to Rodriguez directing him to keep doing what they were doing. Cullen was not free to end the arrangement. If Cullen tried to renege, the Mexican Mafia would take his property. Rodriguez, however, did not think robbing Cullen was a good idea. The robbery happened after Rodriguez was in federal custody.

The prosecution also offered expert testimony by Rene Enriquez, another former member of the Mexican Mafia. Enriquez joined the Mexican Mafia while in prison in 1985. At that time, the Mexican Mafia was a prison gang that exerted power and control inside prison.

Enriquez testified that the Mexican Mafia began at the Deuel Vocational Institution in Tracy, California, in 1956. According to Enriquez, the gang was violent and non-member prisoners needed protection from it. In the 1970s, a "large" number of Mexican Mafia members were paroled from state and federal prison. They organized to deal drugs on the street. At some point, they were indicted and the Mexican Mafia essentially was dormant on the street until about the 1990s. However, the gang remained active within prison.

In 1988, during this "dormant" period, Enriquez, a "main Mexican Mafia Member," was paroled. Upon release, Enriquez joined up with Hubert Ruiz and Jaco Paella to form a "crew." He met with two known Mexican Mafia members and told them he wanted to demand protection money from drug dealers and others engaged in criminal activity in Boyle Heights. Enriquez then proceeded to do so. In 1989, Enriquez discovered that Cynthia Galavon, a drug distributor for his crew, had been stealing drugs. He ordered her killed because she "violated the edict and disrespected the Mexican Mafia." On orders of the gang, Enriquez also killed David Gallegos, a Mexican Mafia member on the gang's hit list, with assistance from Ruiz and Paella. By 1992, Enriquez was in county jail.

In 1992, to obtain power outside prison, the Mexican Mafia entered into an agreement with Southern California street gangs. The gangs would carry out criminal activities for the Mexican Mafia, with the power of the Mexican Mafia behind them.

In 2013, when the events in this case occurred, the Mexican Mafia had 125 to 150 members. The gang's primary activities were murder, extortion, assault, and narcotics distribution. A black hand was a key symbol of the Mexican Mafia. The number 13 used alone signified a person had been sponsored to join the Mexican Mafia. The Mexican Mafia also used Aztec imagery, particularly Quetzalcoatal Nahuatl, a two-head serpent. Another symbol of the Mexican Mafia was a Mayan marriage symbol consisting of two lines and three dots.

Given a hypothetical based on the facts of this case, Enriquez opined that the extortion of Cullen was committed for the benefit of the Mexican Mafia because it would enhance its reputation and provide members with money. In response to a

7

hypothetical which further assumed that a "legitimate" Mexican Mafia member had two younger Mexican Mafia members retrieve the money on their collective behalf, Enriquez opined the crime would be at the direction of the Mexican Mafia and in association with the Mexican Mafia.

The defense offered the testimony of its own gang expert, Martin Flores. In response to a hypothetical that tracked the facts of this case, Flores opined the crime was not committed to benefit the Mexican Mafia, but was committed by individuals taking advantage of an opportunity for their own interests.

Appellant also testified in his own behalf. He admitted he was one of the first 12 members of the Mexican Mafia. He did not sponsor or make anyone a member of the Mexican Mafia. Appellant did not ask anyone to commit a crime for him. Rodriguez and Garcia would sometimes give him money, but he never asked for the money and did not know its source. Cullen gave appellant money once for doing a favor. He asked Cullen if that meant they were partners and Cullen said yes. Appellant assumed he had a consensual agreement with Cullen to protect his dispensary.

## DISCUSSION

Appellant originally contended the Mexican Mafia is not a "criminal street gang" within the meaning of section 186.22, subdivision (b), and even if it currently qualifies as such a gang, it did not qualify at the time of the predicate acts used to prove the section 186.22 enhancement.

A.     ***A Gang Which Is Founded in Prison May Satisfy Section 186.22's Definition of a Street Gang***

Soto contends section 186.22, subdivision (b), by its plain language, only applies to "criminal *street* gangs." (Italics added.) He contends the Legislature's intent to limit the scope of section 186.22 to "street" gangs is further shown by the language in section 186.21.

Appellant attaches significance to the Legislature's use of the phrase "criminal *street* gang" in section 186.22. (Italics added.) He acknowledges the STEP Act "fails to distinguish between street gang and prison gangs," but contends that the term "street gang" has a "common or plain" meaning and because the Legislature selected that term it "should not be interpreted to include other types of gangs." Notably, appellant does not elaborate on what the "common or plain" meaning of the term is, apart from claiming it does not embrace a prison gang.

When a statute provides a specific definition of a term, the term "must be understood as it is defined, not in its colloquial sense." (*People v. Gonzales* (2017) 2 Cal.5th 858, 871.) Put differently, "[t]he plain and commonsense meaning governs '*unless* the statute specifically defines the words to give them a special meaning.'" (*Jackson v. LegalMatch.com* (2019) 42 Cal.App.5th 760, 768, italics added.)

The California Supreme Court has described the phrase "criminal street gang" as "a term in colloquial usage that is nonetheless given a specific meaning in the STEP Act. The STEP Act defines a 'criminal street gang' as an 'ongoing organization, association, or group.' (§ 186.22[, subd.] (f).) That 'group' must have 'three or more persons,' and its 'primary activities' must consist of certain crimes. (*Ibid.*) The same 'group' must also have

'a common name or common identifying sign or symbol,' and its members must be proven to have engaged in a 'pattern of criminal gang activity' by committing predicate offenses." (*People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*).) Because the Legislature has defined a criminal street gang by its organizational or associational characteristics and its criminal activities, with no requirements as to the gang's geographic origins or its members' geographic location, we must understand the term as defined, not in any colloquial sense described by appellant.

We recognize the Legislature used the phrase "street gang" elsewhere in the STEP Act, notably in the title of the Act and in section 186.21, entitled "Legislative findings and declarations." Thus, we cannot simply disregard the Legislature's use of the word "street." The rules of statutory interpretation require us, "if possible, to give effect and significance to every word and phrase of a statute." (*People v. Guzman* (2005) 35 Cal.4th 577, 588.) Indeed, "[w]e must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476.)

Appellant has urged us to consider section 186.21, although we each focus on different parts of that section.[3] Appellant

---

[3] Section 186.21 provides: "The Legislature, however, further finds that the State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods. These activities, both individually and collectively, present a clear and present danger to public order and safety and are not constitutionally protected.

focuses on the following sentence in section 186.21: "The Legislature, however, further finds that the State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." Appellant contends this sentence evidences a legislative intent that the STEP Act apply only to "street" gangs who operate in "neighborhoods" against "peaceful" individuals and not to prison gangs who commit crimes against gang members or the incarcerated. We find the Legislature's statement descriptive of a problem, not restrictive or prescriptive of its solution.[4]

The Legislature finds that there are nearly 600 criminal street gangs operating in California, and that the number of gang-related murders is increasing. The Legislature also finds that in Los Angeles County alone there were 328 gang-related murders in 1986, and that gang homicides in 1987 have increased 80 percent over 1986. It is the intent of the Legislature in enacting this chapter to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs. The Legislature further finds that an effective means of punishing and deterring the criminal activities of street gangs is through forfeiture of the profits, proceeds, and instrumentalities acquired, accumulated, or used by street gangs."

[4]     In the 30 years since the STEP Act became law, the California Supreme Court and every Court of Appeal in California have routinely affirmed true findings on section 186.22 gang allegations where the victim is a gang member. If the Legislature's statement was intended to limit the scope of section 186.22 to "peaceful citizens," by now the Legislature

We find that the next sentence of section 186.21 more clearly explains the Legislature's focus and concerns: "These activities, both individually and collectively, present a clear and present danger to public order and safety." The meaning of the Legislature's selection of the word "street," is found here, in its concern with "public" order and safety. In light of this concern, the phrase "street gangs" serves the useful function of describing gangs whose members commit crimes "in the streets," where they pose a danger to "public" order and safety. Thus, a gang which was founded in prison may be considered a street gang if its members commit crimes outside prison, where the crimes pose a danger to public order and safety. Because our Supreme Court has made clear that a criminal street gang may be "a geographically dispersed group" (*Prunty*, *supra*, 62 Cal.4th at p. 85), not all members need be on the streets.

---

would have made that intent clear by amending the statute. It has not done so.

Similarly, the descriptive nature of the Legislature's reference to crimes in "neighborhoods" is shown by an examination of subdivision (e), which defines a pattern of criminal activity. The Legislature has included crimes in section 186.22, subdivision (e) which do not require physical proximity to the victim and which may take place entirely electronically, such as information theft or money laundering. The inclusion of these crimes is not consistent with an intent to limit the application of section 186.22 to crimes committed in a victim's neighborhood.

B. ***The Predicate Offenses Satisfy the Sameness and Other Requirements of the STEP Act.***

Appellant argues that the predicate offenses proved by the prosecution were insufficient to support the gang enhancement because (1) they involved a gang member killing another member of the same gang for violating gang rules and (2) they occurred while the Mexican Mafia was a prison gang only and cannot be used against the "street" gang Mexican Mafia.

### 1. *Intragang Crimes*

Appellant contends that the predicate murders do not involve innocent people who are being victimized in their neighborhoods. Therefore they are not the type of crime the STEP Act seeks to prevent and cannot qualify as predicate offenses.

"The statute does not exempt from its scope those predicate offenses committed by gang members as part of internal gang disputes or power struggles." (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1004 [competent proof that one member of gang shot another would suffice to show predicate offense for a pattern of criminal gang activity].) "Intragang violence threatens public order and safety much the same as criminal conduct directed specifically against persons outside the gang." (*Ibid.*)

### 2. *Sameness*

Appellant claims there are two different Mexican Mafia gangs, the prison gang founded in the 1950s and a street gang founded in 1992 when the Mexican Mafia entered into an agreement with Southern California street gangs to extend its reach outside prison. He contends the "sameness requirement" of section 186.22, subdivision (f) precludes the predicate murders

committed in 1989 by members of the original prison Mexican Mafia from being used to prove the existence of the street Mexican Mafia.

Our Supreme Court has explained that the STEP Act "requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and the predicate offense requirements of section 186.22[, subd.] (f), must be one and the same." (*Prunty*, *supra*, 62 Cal.4th at pp. 75–76.)

We review the sufficiency of the evidence to support a gang enhancement using the same standard applied to a conviction. (*People v. Rivera* (2019) 7 Cal.5th 306, 331.) We review " ' "the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) " 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] The standard is the same whether the prosecution relies on direct or circumstantial evidence." (*People v. Rivera*, *supra*, 7 Cal.5th at p. 331.)

While appellant correctly identifies the legal requirement of sameness, he is mistaken about the facts of this case. Enriquez testified a large number of Mexican Mafia members

were released from prison in the 1970s, engaged in drug trafficking for a period of time, and were arrested and imprisoned.  Thus, the Mexican Mafia had a long history of street crime.  Appellant points out that Enriquez testified that after the 1970s parolees were re-incarcerated, the Mexican Mafia went dormant until 1992, when the Mexican Mafia entered into an agreement with street gangs to expand its power on the streets. We question the relevancy of this dormancy, as it could occur in any gang with a large number of imprisoned members.[5]

We will assume for the sake of argument that the Mexican Mafia could not be considered a criminal street gang once it went dormant on the streets, and the recommencement of criminal activity on the street by the Mexican Mafia meant that a new criminal street gang was formed.  However, this does not assist appellant.

Although Enriquez testified the Mexican Mafia was dormant until 1992, Enriquez also testified he was released from prison in 1988 as "a main Mexican Mafia Member."  As set forth in more detail in the Background section above, Enriquez then formed a crew, sought permission from the Mexican Mafia to commit illegal activities, and then engaged in extortion and drug

---

[5]  Section 186.22, subdivision (f) does require a criminal street gang to be an "ongoing organization, association or group" but appellant quotes this phrase only as part of his summary of the overall subdivision (f) definition of a criminal street gang.  He does not rely on it to show the significance of his dormancy argument and does not offer any argument about the meaning of the word "ongoing" in this context.  There is no dispute that the Mexican Mafia was an ongoing organization in prison during this time.

dealing.  In 1989, Enriquez learned Cynthia Galavon, a drug distributor for his crew, had been stealing drugs.  He ordered her killed because she "violated the edict and disrespected the Mexican Mafia."  Enriquez was also ordered to kill David Gallegos, a Mexican Mafia member on its hit list.  He did so with assistance from his crew.  Thus, viewing the evidence in the light most favorable to the true finding, Enriquez's testimony about his own activities proved that the Mexican Mafia recommenced criminal activity on the street in 1988.  The predicate offenses of murder do not pre-date the re-birth of the street Mexican Mafia; they are a result of that re-birth.

To the extent appellant alternatively contends the Mexican Mafia became a different gang as a result of the 1992 agreement with Southern California street gangs, we do not agree.  While the Mexican Mafia may have worked through "street" gangs in other instances, it did not lose its existing identity and did not work through a "street" gang in this case.  The People's theory was that the Mexican Mafia was itself a unitary criminal street gang, and acted as such in the present case.  As we have discussed at some length, the People relied on predicate acts by Mexican Mafia members; offered expert testimony that the Mexican Mafia was an ongoing organization with a common name and identifying symbols; proved that appellant, Rodriguez and Garcia were Mexican Mafia members who personally committed the charged extortion at the direction of and in association with appellant, a founding member; and offered expert testimony that the extortion benefited the Mexican Mafia.

16

C.    ***The Proven Predicate Offenses No Longer Satisfy the Requirements of Amended Section 186.22.***

Section 186.22 requires proof of two or more predicate offenses committed by the gang of which defendant is alleged to be a member.  (*Id.*, subd. (e)(l).)  At the time of trial, there was no time limitation as to when a predicate offense must have occurred.  It is undisputed that the three predicate offenses offered by the People to support the gang enhancement occurred in 1992 or earlier.  Assembly Bill No. 333 amended section 186.22 to provide that the last of the predicate offenses must have occurred within three years of the alleged date of the commission of the current offense.  (§ 186.22, subd. (e)(1).)  The current offense was committed beginning in 2013 and so the predicate offenses previously proven by the People no longer satisfy the requirements of section 186.22.

Both parties agree this change to section 186.22 is retroactive and applies to appellant's case as his case is not yet final on appeal.  We agree as well.  (*In re Estrada* (1965) 63 Cal.2d 740, 748 [statutory changes that reduce the punishment for a crime apply retroactively to all judgments not yet final on the statute's effective date]; *People v. Nasalga* (1996) 12 Cal.4th 784, 792 [*Estrada* applies to penalty enhancements]; *People v. Vinson* (2011) 193 Cal.App.4th 1190, 1195–1196 [amendment increasing number of prior convictions for felony theft sentencing retroactive; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 69–71 [amendment raising threshold for drug enhancement is retroactive].)

17

Appellant contends, without citation to legal authority, that the entire matter must be dismissed. He is mistaken. The enhancement may be retried. "When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand. [Citation.] Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the [newly added element] was not relevant to the [enhancement] at the time of trial and accordingly, this question was never tried." (*People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

If the People elect not to retry the enhancement, or if the enhancement is found not true, the parties may brief the issue of the statute of limitations for the trial court. We cannot agree with the People that appellant has forfeited this issue. He raised this issue in his opening brief on appeal and noted that the trial court had previously "acknowledged" that if the enhancement were found not true, the underlying charge would have to be dismissed for lack of jurisdiction because the three-year limitations period for extortion would have expired The People did not dispute this statement in any way in its original briefing. In any event, the issue is not ripe for decision until the trial court addresses upon retrial the sufficiency of the evidence in support of the enhancement. The issue is not forfeited.[6]

---

[6] We urge the parties to proceed as expeditiously as possible in line with any remaining Covid restrictions and in light of appellant's very advanced age.

18

**DISPOSITION**

The true finding on the section 186.22 enhancement allegation is reversed and the matter is remanded to permit the People to re-try the allegation. If the People elect not to re-try the allegation, or if the allegation is found not true, the trial court shall decide whether the statute of limitations requires reversal of the underlying extortion conviction. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.